PLATTE VALLEY DRAINAGE DISTRICT OF WORTH COUNTY, RESPONDENT, v. NATIONAL SURETY COMPANY, APPELLANT.*

Kansas City Court of Appeals. November 8, 1926.

*Corpus Juris-Cyc References: Agency, 2CJ, p. 428, n. 95; p. 429, n. 98; p. 570, n. 31; p. 583, n. 9; p. 586, n. 16; p. 944, n. 96; p. 956, n. 86; Appeal and Error, 4CJ, p. 659, n. 56; p. 764, n. 76; Contracts, 13CJ, p. 342, n. 7; p. 355, n. 64; Courts, 15CJ, p. 950, n. 59; p. 1083, n. 69; Frauds, Statute of, 27CJ, p. 136, n. 24; p. 146, n. 93; p. 167, n. 49.

*Sebree, Jost & Sebree* and *Henry L. Jost* for appellant.

*Ed Kelso, DuBois & Miller, Chas. H. Mayer* and *Floyd M. Sprague* for respondent.

## ON REHEARING.

BLAND, J.—This suit is upon an oral contract wherein defendant is alleged to have assumed, upon a consideration, to carry out in favor of plaintiff an obligation of a third person. The case was tried before the court without the aid of a jury, resulting in a judgment in favor of plaintiff in the sum of $3212.78 and defendant has appealed.

The facts show that in May, 1920, plaintiff, having decided to provide funds for meeting the cost of certain drainage work by the issuance of bonds, accepted the offer of the J. R. Sutherlin & Company, a corporation of Kansas City, Missouri, to purchase the bonds. To insure the performance of the agreement, plaintiff required the J. R. Sutherlin & Company to execute a bond in the penal sum of $90,000, upon which bond the defendant became surety. The accepted offer of the J. R. Sutherlin & Company was made a part of the bond by being copied therein in full. In its offer the J. R. Sutherlin & Company agreed to buy bonds up to the par value of $200,000, to pay par and accrued interest for the bonds delivered to it and to keep on deposit to the credit of plaintiff in a local bank selected by the latter the sum of $10,000. The remainder of the purchase price of such bonds was to be left on deposit with the J. R. Sutherlin & Company and to be paid to plaintiff as the drainage work progressed and as called for by plaintiff to meet the monthly engineer's estimates. Of the sum so remaining in the hands of the J. R. Sutherlin & Company, it was to pay plaintiff four per cent interest on daily balances.

Plaintiff found it necessary to issue bonds only to the par value of $100,000, which were delivered to the J. R. Sutherlin & Company under the contract. An initial payment of $10,000 on account of the purchase price was made and the remainder, $90,000, was left on deposit with the J. R. Sutherlin & Company. The bond recited delivery of the bonds to the J. R. Sutherlin & Company and that of the purchase price $90,000 had been deposited with that company in accordance with the terms of the agreement. The bond contained the usual conditions and provided for indemnity to plaintiff for loss and damages suffered by reason of the J. R. Sutherlin & Company's failure to perform the contract, and contained a special condition providing, in effect, that if the J. R. Sutherlin & Company should default in any manner in the performance of any of the

things specified in the contract to be performed, plaintiff should give written notice to the defendant "and the whole sum then on deposit or under the control of said principal—J. R. Sutherlin & Company—to the credit" of the plaintiff "shall become immediately due and payable to" the plaintiff.

With the exception that J. R. Sutherlin & Company paid interest from time to time on the money deposited with it, nothing further transpired until in June, 1921, when plaintiff had occasion to call on the J. R. Sutherlin & Company to pay the sum of $4625.52, being the first estimate of plaintiff's engineer. Plaintiff promptly "billed" the J. R. Sutherlin & Company for this amount and that company gave its check for the same, which check was dishonored and went to protest. Thereupon plaintiff unsuccessfully undertook to collect this sum from the J. R. Sutherlin & Company and gave the defendant at its head office in New York City notice by letter of the non-payment but did not make any demand for the whole of the deposit with the J. R. Sutherlin & Company J. R. Sutherlin & Company was not looked to further by plaintiff but no formal release of it was ever made. In response to said notice, Mr. Weichelt, defendant's general attorney for the central district, with headquarters at Chicago, went to Grant City, the home of the attorneys for plaintiff.

Mr. Edward Kelso, one of these attorneys, testified that at the time of the default of the J. R. Sutherlin & Company, it owed the district about $90,000; that when Weichelt arrived the witness showed him the bond and contract and told him that under their provisions plaintiff was entitled to $90,000 and demanded of Weichelt that defendant pay this sum of money; he did not mention any interest upon the deposit. Further on in his testimony the witness stated that he did not make a formal demand for the money but stated to Weichelt that under the provisions of the bond $90,000 was due and "for him to take that upon that basis and have the $90,000 paid to us. At the same time I said to him, now if you don't care to do that . . . if your company does not care to pay us this $90,000 to carry out this contract with Sutherlin & Company, go ahead and complete that contract, we will agree to that." Mr. Kelso testified that he was afraid that the company might attempt to "sidestep" their obligation. Mr. Weichelt replied to Mr. Kelso, "I don't know anything about it. This matter is all new to me—I will have to investigate it." Weichelt returned to Kansas City and afterwards Kelso made several trips to that place when Weichelt would call him up over the phone and ask him to come.

Mr. Kelso further testified that on June 15th Weichelt made a draft upon the defendant in the sum of $4625.52 to pay the first estimate, which was honored by the defendant, this was about a week

after Weichelt first appeared in Grant City. The witness further testified that about thirty days after the negotiations first started when Weichelt first came to Grant City, he and Weichelt arrived at a settlement. Mr. Kelso telling him all the time that he would not insist on the payment of the $90,000 if defendant would carry out the Sutherlin contract; that finally Weichelt called him over the phone and told him that he had word from the general office that "they had everything completed and that they would agree to carry out the contract of Sutherlin & Company if it would be satisfactory." Mr. Kelso replied that it would be, and Weichelt said, "You rest assured that it will be carried out, and you tell your supervisors that they don't need to worry anything about it." Nothing more occurred and Weichelt returned to Chicago. Plaintiff sent its estimates as they fell due to the defendant at New York, which estimates were all paid. At the expiration of six months the payments had amounted to $90,000. The second estimate was not promptly paid so Mr. Kelso wrote to Weichelt at Chicago about the matter and Weichelt replied on a letter-head of defendant that he felt assured that Mr. Magee, the general counsel at New York, would handle the matter satisfactorily; if not, the latter would probably call on Mr. Kelso for any additional information that he might want. When the final estimate came due, which covered the balance of the $90,000, plaintiff for the first time demanded payment of the interest that would have accrued under its contract with the J. R. Sutherlin & Company. Defendant paid this estimate but refused to pay the interest. Mr. Kelso further testified that during these negotiations he called up Mr. Magee in New York City, defendant's general attorney, but that he did not ask him "who Mr. Weichelt was" nor did he inquire of defendant's local agent at Kansas City.

On the part of the defendant Weichelt testified that he was general attorney for the central department of the defendant with headquarters at Chicago, Illinois; that the first he knew of this bond matter was that he received a telegram from New York to go to Grant City; that his duties in such matters were "to investigate them and report findings of my investigations to the New York office, our home office." That the telegram from New York told him to go to Grant City "and see what the condition of the work was and what the bond provided and what, if anything, had been paid, and what the progress was, and investigate it and report;" that when he went to Grant City he saw one of the officers of plaintiff and Mr. Kelso, its attorney; that Mr. Kelso told the witness about the dishonor of the check and said to him that defendant ought to take it up; that the work was going on and that the estimates had to be paid and "he was very anxious that we meet them." The witness told them "that I had nothing to do with it, I was just down here to get

information, and that we would investigate it, and I said, 'If there is any liability on our part with the bond, why, we will meet it, but I cannot pass on it until we have it thoroughly investigated.'" That no demand was made for the immediate payment of the $90,000, that the subject was not mentioned at that time; that Mr. Kelso was merely urging that the defendant meet the check that had been protested. The witness further testified that he returned to Kansas City and made further investigations and went to New York and come back; that "I believe we had one or two telephone conversations." Then Mr. Kelso came to Kansas City. Mr. Kelso was worried about the paying of the unpaid estimate and asked the witness to draw a draft on the defendant for the sum, which the witness did. This seems to have been before Mr. Kelso came to Kansas City.

Weichelt testified that it was understood between Kelso and himself that the draft was to be paid "conditionally or pending the conceding of liability on our part." This was about two weeks after he had first seen Mr. Kelso at Grant City and Weichelt told him, "I was still investigating it and could not do anything further about it" and told him that "when the company had indicated its attitude as to whether or not it would admit liability on the bond that he could depend on it, I would let him know." The conversation Weichelt had with Mr. Kelso in Kansas City was about two weeks after the first conversation at Grant City and after the draft had been drawn. After this conversation Weichelt received word from the home office that his draft had been honored, indicating, "that the company would meet the estimate as they came due." Subsequent to the last conversation mentioned with Mr. Kelso, or in the interim, "I went to New York and reported in person and reported findings by long distance telephone." The witness testified that on Saturday, after the last conversation, Mr. Magee, general counsel of the defendant at New York, called the witness up over the long distance telephone and "we had discussed some defenses to the bond, and Mr. Magee said—the gist of our conversation was—that we would recognize liability on the bond, and pay the estimates as they came due." The witness then called up plaintiff's attorney at Grant City, as he had promised, and told him that "We would, as far as I knew, recognize liability on the bond." The witness then went back to Chicago, his work being finished.

Weichelt further testified that while no demand was made for the immediate payment of the $90,000, "there was some talk that they could collect the $90,000 by the bond, but that they would be satisfied if we would pay the estimates." This occurred at the first time he met Mr. Kelso at Kansas City. He testified that he at no time told plaintiff or anyone connected with it that defendant would perform the Sutherlin contract. He denied that he had authority to make

any contract with plaintiff. However, he testified that "our understanding was that if we paid the estimates as they came due, the drainage district was satisfied." He stated that he knew that there had been a "default of the bond" if "there weren't any defenses to the bond."

After Weichelt left, plaintiff, through Mr. Kelso, regularly "billed" defendant for the estimates, six or seven in number, as they fell due. The estimates and the letters accompanying them usually referred to the bond by number, a typical letter reading as follows:

"Joseph T. Magee, General Solicitor,

"National Surety Company of New York, New York.

"Dear Sir:

"We are herewith enclosing to you Estimates for the month of September for the construction work done on the Platte Valley Drainage District upon which you are making payments under contract with J. R. Sutherlin & Company Re-Bond No. 746, Claim No. 19219." etc.

Defendant in remitting to plaintiff in response to plaintiff's bills sent voucher checks which plaintiff received and cashed, all of which recited that payment was made by defendant in reduction of defendant's *liability under its bond.* The acknowledgment of plaintiff of these payments referred to the bond by number. When plaintiff "billed" defendant for the last time it then for the first time called upon it for payment of interest and its attorney wrote in calling for such final payment that *"this will cancel the bond with you."*

This suit is to recover upon the alleged oral contract testified to by Mr. Kelso that he made on behalf of plaintiff with the defendant through its agent Weichelt. This testimony is to the effect that defendant agreed to pay the estimates as they fell due and carry out the Sutherlin contract. Under the Sutherlin contract a large amount of interest was due for which defendant was not liable on its bond, its liability on the bond being limited to $90,000; this suit is to recover that interest.

There was no declaration of law or finding of fact requested except defendant's demurrer to the evidence, which was overruled, and if the ruling of the court can be sustained on any theory, it must be upheld. [Bufton v. Express Co., 216 S. W. 630.] Defendant insists that there never was at any time a breach of its bond and if there were, it was waived by the acceptance by plaintiff of the money from defendant covering the first estimate upon which the breach was based and "that being so, the alleged oral agreement on which the suit is based is without any legal foundation and plaintiff ought not to be allowed to recover." There is no question but that there was a breach of the contract and bond when Sutherlin & Company failed to pay the first estimate and under the terms of the bond the entire

balance that the bond was given to secure became immediately due and payable, and this without any demand being made by plaintiff for the payment of the amount due as the bond did not provide that it become due at the option of plaintiff. [Rubens v. Prindle, 44 Barbour 336; Rozekrantz v. Durling, 29 N. J. L. 191.]

In arguing that the sum of $90,000 was not due on the bond at the time of the default in Sutherlin & Company's undertaking by its not meeting the first estimate, defendant says that this was the penalty of the bond and that forfeitures are not in favor in the law. By the special condition of the bond the penalty of the bond was not to be paid but merely whatever amount should be due upon the bond at the time of any default on the part of Sutherlin & Company. The fact that in this instance the balance owing by the Sutherlin & Company happened to be $90,000, would not affect the situation. If it had been less, by the terms of the bond it would not have been required to pay the $90,000. [See State ex rel. v. Ellison, 287 Mo. 683, 693.] The requirement of the payment of the balance due at any time Sutherlin & Company defaulted in its contract, was not an unusual one, it seems to have been a fair, proper and natural provision. Sutherlin & Company had $90,000 of the money of plaintiff and if it failed to repay any part of this sum when demand was made for the same, it was quite natural for the plaintiff not to want to be further harassed in reference to the matter but would desire the full amount unpaid to be paid at once. This was in the nature of liquidated damages. There was no forfeiture involved. The bond, as before stated, only provided for the payment of the actual amount due and this was all that plaintiff was claiming. [Berrinkott v. Traphagen, 39 Wis. 219.]

Defendant did not have the right, as it contends, to step into the shoes of the principal and pay its obligations as they became due in accordance with the terms of the contract. The obligation was upon it to pay plaintiff the sum of $90,000. There was no waiver of the breach. Plaintiff's attorney testified, and we must take plaintiff's evidence in considering a demurrer to the evidence, to the effect that beginning with Weichelt's visit to Grant City plaintiff was insisting that it was entitled to the sum of $90,000. It is true that before the alleged oral contract was made defendant paid the amount due on the first estimate, which was all that was due on the contract at the time had it not been breached, unless it was some interest about which the record is not plain. Plaintiff did not waive the breach by accepting this sum. It will be remembered that this payment was tendered to plaintiff conditionally, defendant reserving the right to deny liability on the bond.

It is insisted that there is no evidence to show that Weichelt was such an agent as to have had authority to make the contract relied up-

on. Of course, if Weichelt's authority was only that of an agent to investigate and report, he would have no authority, implied or otherwise, to do such an unusual thing as to enter into an oral contract superseding the written contract evidenced by the bond. [2 C. J., pp. 428, 429, 583, 586; Meegan v. Illinois Surety Co., 195 Mo. App. 423, 428, 430.] Assuming that there is no direct evidence that he had authority to enter into the oral contract relied upon, proof of agency, like proof of other facts, may be shown by circumstantial evidence. [Mosby v. Commission Co., 91 Mo. App. 500, 504, 505.]

It would seem that it is merely a question as to what the oral contract consisted of; whether that testified by Kelso or that indicated by the testimony of Weichelt. The trial court found according to Kelso's version. There were notations on the draft and vouchers sent by the defendant to meet these estimates to the effect that they were sent in reduction of its liability on the bond, and in the correspondence carried on by Mr. Kelso he refers to the payments being upon the bond and in his letter demanding the final payment and interest he says, "this will cancel your bond." However, we cannot take these circumstances as conclusively showing that the payments made by the defendant were on the bond and not upon some oral contract, for the reason that the testimony on both sides of this case shows that the parties were not operating under the condition of the bond, which required the payment of $90,000 in a lump sum. Of course, these payments were being made and demanded on account of the fact that there had been a bond in existence and growing out of that fact and it may have been that the parties had this in mind when they used the language that we have referred to. But whatever may have been their intention, whether a failure to use exact terms on the part of Kelso or some peculiar manner of keeping books and records on the part of defendant, we cannot give them as a matter of law the effect that defendant would have us, to-wit, that payments were being made upon the bond.

The acts of the defendant are entirely inconsistent with the idea that Weichelt's authority was confined to merely investigating and reporting. Weichelt was permitted by defendant to use its stationery wherein he was represented as "GENERAL ATTORNEY, CENTRAL DEPARTMENT." While there is no evidence as to the meaning of the designation, the title itself suggests that he was something more than an ordinary agent. [Cross v. Railroad Company, 141 Mo. 132, 146, 147; New Amsterdam Casualty Company v. Trust Company (Ind.), 142 N. E. 727, 730; Vogemann v. American Dock & Trust Company, 115 N. Y. Sup. 741.] Weichelt had not been on the ground but a short time until he drew a draft in payment of the first estimate, which was promptly paid by the defendant. From this it may be inferred that he had at least authority to settle the indebted-

ness of the defendant conditionally and *pro tanto*. Weichelt was reporting to the defendant during all the thirty days that he was on the ground, by telephone conversations, writing and in person, and, finally, he was told by the company, according to his testimony, that it would pay the estimates as they became due.

After this information was conveyed to Kelso, Weichelt left and plaintiff sent in its estimate which was paid by the defendant without any exception or reason why it was doing so other than stating that it was in reduction of its liability on the bond, which, as before stated, was not technically correct as it was paid upon some oral contract and the inference is plain that it was making these payments as the result of some arrangement made by Weichelt with plaintiff; exactly what this arrangement was is not indicated by defendant's conduct but enough is indicated to show that it was an agreement adjusting its liability on the bond by making a parol contract with plaintiff, which contract was at least to cover the payment of $90,000 in settlement to meet the estimates as they fell due. Defendant entrusted to Weichelt the entire matter of adjusting plaintiff's claim and if he had authority to make this kind of a contract, which defendant's conduct tends to show he did, we think he was such an agent as to have authority to make the character of contract relied upon by the plaintiff in this case.

Aside from this, Weichelt testified to the effect that after the company had determined what its attitude was in reference to its liability as the result of default of Sutherlin & Company, he had authority "to conclude negotiations with Kelso." And while at one place in his testimony he stated that when he left, the company had not finally determined what its attitude would be, the inference to be drawn from the acts and conduct of the defendant is that the company had then finally determined what its attitude would be, and if it had done so, according to Weichelt's own testimony, he had authority to make a contract covering the situation.

It is claimed that there was no consideration for the oral contract but there is clearly no merit in this contention. The consideration of defendant's promise to pay the interest on the daily balances, as provided in the contract of Sutherlin & Company, and to meet the daily balances as they became due, was plaintiff's agreement to waive the right to meet the payment of the $90,000 in a lump sum. The consideration for plaintiff's promise to extend the time of payment to defendant, was the undertaking by defendant to pay the interest when any was payable. There is no question but that this was a sufficient consideration. [13 C. J. 342, 355.]

It is insisted that the oral contract was within the Statute of Frauds. The Statute of Frauds was pleaded in the answer but the evidence of the oral contract was not objected to. In fact, the Statute

of Frauds was not mentioned at any time during the trial. Under these circumstances the defense, if there be one under that statute, has been waived. [Miller v. Harper, 63 Mo. App. 293.]

It is insisted that the verdict is excessive but an examination of the record discloses that it was in effect agreed that if plaintiff was entitled to recover, that it was entitled to the amount that the court found to be due less the interest upon the same, which the judgment of the court includes. In defendant's motion for a new trial it was set up that the finding and judgment of the court "constitutes an unwarranted modification, alteration and abolition of the contract between defendant and plaintiff evidenced by its bond to plaintiff . . . and amounts to an impairment and destruction of defendant's liberty of contract, as guaranteed to defendant by the provision of section 4, of the Constitution of Missouri and amounts to depriving defendant of its property without due process of law, contrary to the provisions of section 30, article 2 of the Constitution of Missouri and of the Fourteenth Amendment to the Constitution of the United States." And—

"The court, by its finding and judgment, creates and establishes between the plaintiff and the defendant a new agreement and undertaking not agreed to by the defendant, and amounts to taking the defendant's property without due process of law in violation of section 30, Article 2 of the Constitution of Missouri and of the Fourteenth Amendment of the Constitution of the United States, and is an interference with and impairment of defendant's liberty of contract, as guaranteed by section 4, Article 2 of the Constitution of Missouri."

It is insisted that the constitutional question having thus attempted to be injected into the case, the jurisdiction is in the Supreme Court. There is no merit in this contention. [Johnson v. Ins. Co., 212 Mo. App. 290, 306, 307.]

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.

## On Motion for Rehearing.

BLAND, J.—In the main opinion in this case we stated "The Statute of Frauds was pleaded in the answer but the evidence of the oral contract was not objected to. In fact, the Statute of Frauds was not mentioned at any time during the trial. Under these circumstances the defense, if there be one under that statute, has been waived." [Miller v. Harper, 63 Mo. App. 293.]

Defendant insists that the Statute of Frauds was pleaded and therefore it was sufficiently raised in the lower court although it was not in any other manner called to the attention of the trial judge. In support of this contention defendant cites the case of Smith v. Hainline, 253 S. W. 1049, 1052, 1053, and other causes not directly

in point but containing some general language which may be suscept-ible to the construction that defendant contends for. However, no case is cited overruling directly or indirectly or criticising the case of Miller v. Harper, supra, cited by us. On the other hand, we find cases citing it with approval, but not upon the specific question in-volved in this case. However, we prefer to dispose of the question of the Statute of Frauds in this case upon a different ground than that stated in the main opinion, as we have concluded that the statute is not applicable under the facts in this case whether or not it was properly raised in the trial court.

The agreement of the defendant to carry out the contract of Sutherlin & Company was not made for the purpose of favoring that company by satisfying its obligation to plaintiff but was entered into for the primary purpose of extinguishing defendant's liability to plaintiff. The promise made by the defendant was not for the sake of Sutherlin & Company but for the purposes of and benefit to the defendant. The payment of the debt of Sutherlin & Company was merely an incident. The benefit to the defendant was the main thing involved and was the motive and inducement for the promise. Under such circumstances it is held that the statute has no applica-tion, and this is true even though Sutherlin & Company remained liable. [Hill Bros. v. Bank of Seneca, 100 Mo. App. 230, 204; Winn v. Hillyer, 43 Mo. App. 139, 143; Barham v. Colp, Arnold & Co., 87 Mo. App. 152, 157; Barker v. Scudder, 56 Mo. 272, 275; Bradshaw v. Cochran & Burnham, 91 Mo. App. 294; Moore v. McHaney, 191 Mo. App. 687, 695, 696; Walther v. Merrell, 6 Mo. App. 370, 373, 374; Martin v. Harrington, 174 Mo. App. 707, 708-711.]

"An oral promise which, under the circumstances, is in effect a promise to pay a debt due from the promisor himself is not within the statute, although the incidental result of the performance may be the discharge of a debt of another. Where the promisor is already jointly liable with others, his guaranty of performance is not within the statute. This rule does not extend to an oral promise to pay an amount in excess of that for which the promisor is legally liable." [27 C. J. 136, 137.]

Of course, in this case defendant was not originally obligated to pay the interest mentioned in the main opinion but it will be remem-bered that there was not only an agreement to pay a debt due from defendant to plaintiff but there was also a promise to pay in a dif-ferent manner than that for which defendant was liable; that is to say, the obligation of defendant was to pay the sum of $90,000 in a lump sum while the agreement was that defendant be permitted to pay that sum over a period of time. In other words, the new contract was something more than merely an agreement to pay the debt to plaintiff for which defendant was liable at the time the contract was

entered into, there was also an agreement on defendant's part to pay interest which was supported by a new consideration as stated in the main opinion. While we have no criticism of the statement of the rule laid down by Corpus Juris that the "rule does not extend to an oral promise to pay an amount in excess of that for which the promisor is legally liable," yet in this case there was a new consideration in the form of a benefit to defendant for its promise, which included the agreement to pay the interest, and its promise must be considered as direct and original in all respects and not collateral. [See cases last cited.]

We have examined the case of Meegan v. Illinois Surety Co., 195 Mo. App. 423, but find that that case finally went off on the sole question of agency; what was said concerning the Statute of Frauds was not necessary to a disposition of the case and therefore is not to be taken as authority upon the question. [See the opinion on rehearing in that case at l. c. 430.]

The motion for a rehearing is overruled.